## IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) KELLY HAZLITT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 20-cv-00672-GKF-JFJ** |
| | ) | |
| (1) LIFE INSURANCE COMPANY OF | ) | **ATTORNEY LIEN CLAIMED** |
| NORTH AMERICA, | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff, Kelly Hazlitt, for her cause of action against Defendant, Life Insurance Company of North America ("LINA"), alleges and states as follows:

### I.      Jurisdiction and Venue

1.      Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover benefits due under an employee benefit plan, and to recover costs and attorney's fees as provided by ERISA.

2.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under 29 U.S.C. § 1132(f), this Court has jurisdiction without regard to the amount in controversy or the citizenship of the parties.

3.      Venue is properly in this district pursuant to 29 U.S.C. § 1132(e)(2), in that the breach took place in this district, and pursuant to 28 U.S.C. § 11391(b), in that a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

### II.      Parties and Plan

4.      Plaintiff is a fifty-eight (58) year-old female. She resides in Broken Arrow, Oklahoma and within this judicial district.

5.      At all relevant times, Plaintiff last worked as an Endocrine Nurse for Oklahoma

Heart Institute ("Oklahoma Heart") in Tulsa, Oklahoma.

6.      Upon information and belief, Oklahoma Heart is a subsidiary or affiliated company of AHS Management Services, Inc. d/b/a Ardent Health Services ("Ardent").

7.      LINA is a foreign insurance company having its principal place of business in Philadelphia, Pennsylvania.   At all relevant times, LINA was licensed and authorized to sell insurance within the State of Oklahoma and it transacts business within the State of Oklahoma and within this judicial district.

8.      Oklahoma Heart, through its affiliation with Ardent, provided long term disability ("LTD") insurance coverage to its eligible employees through a welfare benefit plan (the "LTD Plan").   The LTD insurance coverage applicable to Plaintiff was pursuant to a group LTD insurance policy issued by LINA, Policy Number FLK-0980223 (the "LTD Policy").

9.      At all relevant times, Plaintiff was eligible to participate in the LTD Plan, did participate in the LTD Plan, and was a participant in the LTD Plan within the meaning of 29 U.S.C. § 1002(7).

10.     The LTD Plan is administered by LINA and benefits under the Plan are paid by LINA.   Benefit determinations with respect to Plaintiff's claim for LTD benefits under the LTD Plan are, and at all times relevant, were made by LINA.

11.      LINA was and is a LTD Plan fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).

12.     The LTD Policy defines "**disability**" as follows:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1.   unable to perform the material duties of his or her Regular Occupation; and

2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2. unable to earn 60% or more of his or her Indexed Earnings.

13.     The LTD Plan and related LTD Policy do not contain any provision wherein discretion is expressly reserved to LINA to determine benefit eligibility or entitlement.

14.     Accordingly, a *de novo* judicial review applies to Plaintiff's claim.

### III.     Allegations Applicable to All Claims

15.     Plaintiff began working for Oklahoma Heart in or about March 2016.

16.     Plaintiff elected the LTD coverage made available to her by Oklahoma Heart.  The no-cost "core" benefit rate of the LTD coverage provided to Plaintiff by Oklahoma Heart was 40%.

17.     Pursuant to the option to do so, Plaintiff elected to "buy-up" additional LTD coverage at a 60% benefit rate.  Plaintiff paid for the additional "buy-up" coverage via post-tax withholdings from her Oklahoma Heart paycheck.

18.     Plaintiff's annual rate of pay at the time she last worked for Oklahoma Heart was $67,110.80.  Accordingly, Plaintiff's monthly wage rate was $5,591.73.

19.     Plaintiff ceased working in November 2017 due to injuries she sustained in a high-speed motor vehicle accident ("MVA").  A drunk driver hit Plaintiff's car, causing severe damage such that Plaintiff had to be cut out of the car with the "jaws of life."

20.     On or about January 26, 2018, Plaintiff contacted LINA to initiate a LTD claim because she was unable to return to work due to her debilitating conditions.

21.     Plaintiff subsequently completed and submitted her LTD claim-related paperwork to LINA. In the initial claim papers, Plaintiff described her condition as "Traumatic neck injury, right shoulder & arm injury with continued pain in neck, right arm radiculopathy & paresthesia, numbness, weakness in right arm & hand."  Plaintiff advised that neck surgery was necessary.

22.     LINA initiated an investigation on Plaintiff's claim.  The investigation included the retrieval and review of Plaintiff's pertinent medical records from her treating physicians, Dr. Jon Cox, Dr. James Rodgers, and Dr. Frank Tomecek.

23.     Dr. Tomecek's records confirmed that Plaintiff underwent neck surgery on March 1, 2018 – an anterior cervical disectomy and fusion.

24.     On or about March 16, 2018, LINA approved Plaintiff's LTD claim for payment. The monthly LTD benefit amount was $3,355.00.

25.     By May 2018, LINA started requesting further information regarding Plaintiff's physical abilities.

26.     Plaintiff's primary treating physician, Dr. Cox, completed a Physical Ability Assessment ("PAA") form at LINA's request.  In the PAA dated May 31, 2018, Dr. Cox limited Plaintiff's sitting, standing, walking, reaching, manipulation and grasping with right hand, lifting, carrying above 10 pounds, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, and crawling to *occasional* (0-2.5 Hrs/Day).

27.     In May 2018, in relation to Plaintiff's then pending claim for Social Security Disability Income ("SSDI") benefits, Plaintiff completed an Adult Function Report and advised as follows:

> My physical and mental limitations from injuries from the 11/25/17 car crash have not allowed me to do a job at a substantial and gainful activity level.  My continuous neck pain and decreased range of motion, and decreased right arm and hand dexterity, and continuous weakness, fatigue, and decreased memory along with

PTSD (anxiety, fears, sleep, disruptions), impair my ability to stay on task, concentrate, or perform complex tasks, remember verbal instructions, or sit or stand for prolonged periods, or to type/use keyboard for prolonged periods (difficult to physically type with right hand for more than 15-30 minutes at computer).

28.     During the SSDI claim investigation, Plaintiff underwent a Mental Status Evaluation.  An in-person evaluation was done by Dr. Johna Smasal on July 18, 2018.  Dr. Smasal opined:

it is likely she is able to perform some work-related mental activities, such as ability to understand and remember simple instructions. However, given her ongoing symptoms, she can be expected to experience difficulty with concentration, persisting with difficult tasks, social interactions, and adapting to the demands of a work environment.

29.     Following the Mental Status Evaluation by Dr. Smasal, a Medical Consultant's Review was done Dr. Thomas Vanhoose.   Dr. Vanhoose concluded that Plaintiff "is only capable of simple work.  Her memory, concentration, and gross and fine motor skills preclude any work beyond simple repetitive tasks."

30.     In September 2018, the Social Security Administration ("SSA") determined that Plaintiff was disabled and approved her to receive SSDI benefits.  The initial SSDI monthly benefit amount was $1,537.00.

31.     In October 2018, Dr. Cox advised LINA that Plaintiff was restricted from heavy lifting and certain nursing-related work tasks pursuant to upper extremity weakness and impaired right-hand fine motor skills.

32.     A LINA nurse reviewed Plaintiff's LTD claim file information on October 30, 2018 and found that the "[m]edical on file supports restrictions evidenced by ongoing unsteady gait, bilateral upper extremity strength deficits, and RUE weakness with impaired motor skills."

33.     In March 2019, another LINA nurse reviewed the updated LTD claim file information.  The LINA nurse opined as follows:

All restrictions are supported as evidenced by patient with undifferentiated connective tissue disorder, degenerative herniated cervical discs with compression and radiculopathies status post fusion 3/1/18 and chronic Achilles tendonitis with Herberden's nodules, flexor tendon nodules to bilateral index fingers and palms along with continued edema to left ankle and foot.

34.     In September 2019, LINA continued its review of Plaintiff's claim by requesting updated records from her treating physicians and notifying Plaintiff of the impending change in the definition of "disability" to the "any-occupation" definition.

35.     LINA received updated medical records and information from Dr. Cox.  The medical records reflected Dr. Cox's assessments – that Plaintiff had bilateral leg weakness, right arm weakness, chronic neck pain, poor concentration due to pain, and unsteady gait due to leg weakness.

36.     The LINA-requested forms completed by Dr. Cox reflected Dr. Cox's opinion that Plaintiff could not return to work and she had work-related restrictions and limitations.

37.     In the papers submitted to LINA, Dr. Cox endorsed that, in an 8-hour workday, Plaintiff could *occasionally* sit, stand, walk, reach overhead, reach desk level, reach below waist, lift/carry over 10 pounds, climb balance, stoop, kneel, crouch, and crawl; *frequently* engage in fine manipulation and simple/firm grasping with left, but only *occasionally* engage in fine manipulation and simple/firm grasping with the right, and *frequently* use lower extremities for foot controls.

38.     In October 2019, another LINA nurse conducted another file review of Plaintiff's LTD claim to consider Plaintiff's work-pertinent restrictions and limitations.

39.     The LINA nurse agreed with almost all of Dr. Cox's opinions.  However, according to the LINA nurse, the "[m]edical does not support the restrictions of occasional sit, reach at desk level and the statement if unable to return to work."

40.     The LINA nurse acknowledged that Plaintiff's impaired concentration and focus

were symptoms adversely affecting her functionality, but the nurse did not address or comment on how, or to what extent, Plaintiff's work functionality was affected by those symptoms.

41.     The LINA nurse did not acknowledge or address Dr. Smasal's findings from the Mental Status Evaluation or Dr. Vanhoose's findings upon his Medical Consultant Review.

42.     Because the LINA nurse disagreed with Dr. Cox, the noted plan was to have Plaintiff's LTD claim reviewed by an occupational medicine physician or an internal medicine doctor.

43.     In October 2019, a LINA-employed occupational medicine physician, Dr. Randall Updegrove, reviewed Plaintiff's LTD claim file.

44.     Dr. Updegrove has never treated or examined Plaintiff.

45.     Dr. Updegrove's review was focused solely on Plaintiff's "physical function" and, in particular, whether the physical ability restrictions endorsed by Dr. Cox were supported.

46.     Dr. Updegrove substantially agreed with Dr. Cox's opinions about Plaintiff's work-related restrictions and limitations.  But Dr. Updegrove disagreed with Dr. Cox about Plaintiff's ability to sit during an 8-hour workday.  Dr. Updegrove opined that Plaintiff could sit *frequently* during an 8-hour workday.

47.     Dr. Updegrove did not consider Plaintiff's impaired concentration and focus. Dr. Updegrove acknowledged that Plaintiff's cognitive/concentration/memory issues were outside of his area of expertise.

48.     Following receipt of Dr. Updegrove's report, LINA requested a transferable skills analysis ("TSA") from its vocational department.

49.     The TSA finding was that Plaintiff had the "reasonable functional capacity to perform" the following occupations: Contact Representative (DOT Code 169.167-018) and

Director, Nurses' Registry (DOT 187.167-034).

50.     However, because the TSA was premised on Dr. Updegrove's report and opinions therein, it did not include consideration of Plaintiff's cognitive/concentration/memory issues.

51.     On January 30, 2020, LINA determined to deny Plaintiff's LTD claim under the "any-occupation" definition.  The denial was based on Dr. Updegrove's review and the related the TSA finding based on Dr. Updegrove's opinions.

52.     Plaintiff appealed LINA's decision by letter dated August 5, 2020, and submitted additional information and medical records in support of her claim.  Plaintiff submitted the results from an MRI done on March 9, 2020. She also submitted additional records and information from (1) Dr. Cox; (2) Dr. Brian Torgerson, pain management; (3) Dr. Wesley Stotler, orthopedic surgeon; (4) Dr. Alan Martin, rheumatologist; and (5) Dr. Tomecek.  And Plaintiff submitted occupational information pertinent to the occupations LINA contended she had the functional capacity to perform.

53.     The lumbar spine MRI confirmed mild multilevel lumbar spondylosis, worst at L3-L4 and L4-L5.

54.     Dr. Cox's records evidenced and confirmed Plaintiff's consistent reporting of pain, weakness, and impaired range of motion.  The records confirmed Dr. Cox's abnormal findings on physical examination, including tenderness to palpation along the lower lumbar region and along the distal left Achilles tendon.

55.     Dr. Torgerson's records confirm that he administered a right L5/S1 lumbar transforaminal epidural steroid injection to Plaintiff on April 1, 2020 and April 22, 2020.  And Dr. Torgerson's noted  impression was Lumbar Disc Bulge L3/L4 and L4/L5 and Lumbar Radiculitis.

56.     Dr. Stotler's records evidenced and confirmed his finding of a disruption of the

lateral band of Plaintiff's left lower extremity Achilles tendon, his initial conservative treatment, and subsequent Achilles debridement and Haglund's resection surgery on May 11, 2020.

57.     Dr. Tomecek's records evidenced and confirmed Plaintiff's reporting of lower back pain with right radiculopathy and related testing and treatment.

58.     As reflected in Dr. Tomeck's records, in June 2020, Plaintiff underwent a CT thoracic spine myelogram, a CT lumbar spine post myelogram, and a CT cervical spine post myelogram.

59.     The noted findings from the CT thoracic spine myelogram were loss of disc height at multiple levels with associated degenerative endplate changes and mild flattening of ventral cord at T4-5 and T7-8 without significant stenosis.

60.     The noted impression from the CT lumbar spine post myelogram was moderate spondylosis with spinal and foraminal stenoses.

61.     The noted impression from the CT cervical spine post myelogram was surgical and spondylitic changes of the cervical spine with continued spinal and foraminal stenoses.

62.     Dr. Tomecek's findings, as indicated in the records provided to LINA on appeal, were as follows:

> She has a bilateral L5 radiculopathy, but worse on the right. She has mechanical low back pain and right leg pain that is worse than her neck pain and thoracic pain. Her neck pain is actually tolerable.  She has undifferentiated connective tissue disease.  She sees a rheumatologist, Dr. Alan Martin, and is on Plaquenil. She appears to have a diffuse idiopathic process, which is fusing most of the vertebrae in her thoracic spine.  She underwent a  left Achilles repair six weeks ago by Dr. Wesley Stotler.  She is now able to bear weight on her left foot, and she is wearing a boot.  In a couple of weeks, she is probably going to be able to come out of the boot. At that time, she might be able to proceed with lumbar surgery.
>
> * * *
>
> I explained to her and her husband that she would require a bilateral wide L4 laminotomy, bilateral L4-5 foraminotomy and over 50% facetectomy to

decompress her nerves, resection of ligamentum flavum, and bilateral L4-5 discectomy for decompression.  By doing all of this to decompress her nerves, we would destabilize her spine, in my opinion; therefore, she would require a bilateral posterior lumbar interbody fusion at L4-5 with Life Spine Plateau PEEK cages and morselized autograft, and posterior spinal fusion at L4-5 with Life Spine Center Line instrumentation with OsteoCurrent allograft and bone marrow aspirate from the right iliac crest.

63.     The O*NET occupational information submitted by Plaintiff on her appeal documented that the two occupations LINA thought she could perform were cognitively demanding – requiring critical thinking, deductive reasoning, selective attention, attention to detail, and ability to process information, analyze data, and make decisions in the context of being exact or accurate.

64.     In response to Plaintiff's appeal and submissions, LINA requested "file reviews" on Plaintiff's LTD claim from an occupational medicine doctor and a neuropsychologist.

65.     The requested file reviews were done by Dr. Julie Guay and Dr. Lucien Parillo.

66.     By letter dated October 15, 2020, LINA notified Plaintiff that it had determined to uphold its adverse determination on her LTD claim based on the file reviews done by Drs. Parillo and Guay.  The LINA letter, however, invited Plaintiff to provide a response to the information reflected in the reports done by Drs. Parillo and Guay.

67.     Plaintiff provided a response by letter dated November 9, 2020.  As reflected therein, Plaintiff explained how the file review done by Dr. Guay was substantially irrelevant because of the limited scope of Dr. Guay's review.  In particular, Plaintiff urged that Dr. Guay failed to consider a central issue in the claim – whether Plaintiff's materially diminished memory, concentration, and focus was the by-product of Plaintiff's chronic pain condition.

68.     Plaintiff further explained how Dr. Guay's review was materially flawed because Dr. Guay disregarded all medical information before February 13, 2020 related to Plaintiff's

impaired cognition.  In particular, Plaintiff faulted Dr. Guay for not considering Dr. Smasal's findings on the Mental Status Evaluation and Dr. Vanhoose's conclusions pursuant to his Medical Consultant's Review.

69.     As related to Plaintiff's cognitive function, Plaintiff submitted a "medical source statement" from Dr. Cox wherein Dr. Cox endorsed that Plaintiff was:

> Moderately to Markedly restricted with respect to understanding and remembering complex instructions;
>
> Moderately to Markedly restricted with respect to carrying out complex instructions;
>
> Moderately to Markedly restricted with respect to the ability to make judgments on complex work-related decisions;
>
> Moderately restricted with respect to interacting appropriately with the public;
>
> Moderately restricted with respect to interacting appropriately with supervisor(s);
>
> Moderately restricted with respect to interacting appropriately with co-workers; and
>
> Markedly restricted with respect to responding appropriately to usual work situations and to changes in a routine work setting.

70.     Plaintiff's response letter also addressed the file review done by Dr. Parillo, who had endorsed that Plaintiff could "sit for up to 6 hours" and was "capable of maintaining a full-time work schedule."

71.     In particular, Plaintiff called out Dr. Parillo's serial misrepresentations of the record evidence and noted his failure to address whether Plaintiff, in view of her chronic persistent pain, could attend work on a frequency and consistency sufficient to satisfy an employer in the national economy.

72.     After receiving Plaintiff's response letter and information, LINA asked Drs. Guay and Parillo to provide addendum reports.

73.    Dr. Guay's addendum conclusion was that "the new medical information does not change the previous determination."

74.    Dr. Parillo's addendum conclusion was that "there is no new objective evidence that would warrant me to revise my initial assessment/determination/rationale."

75.    By letter dated December 10, 2020, LINA fully and finally denied Plaintiff's appeal.  The denial rationale stated therein substantially tracks the views expressed by Drs. Guay and Parillo.

76.    The file reviews done by Drs. Guay and Parillo were each, in their own ways, material flawed and not competent evidence upon which to deny Plaintiff's LTD claim.

77.    Dr. Guay has never treated or examined Plaintiff.

78.    Dr. Parillo has never treated or examined Plaintiff.

79.    Dr. Parillo is not an orthopedic physician, neurosurgeon, pain management specialist, or a physiatrist (with a pain subspecialty).

80.    Dr. Parillo was not the most appropriately-trained doctor in field of medicine principally involved in Plaintiff's LTD claim, i.e., spinal impairments and related chronic pain.

81.    LINA's reliance on the file reviews done by Drs. Guay and Parillo is unreasonable and reflects an unprincipled review.

82.    In denying Plaintiff's LTD claim beyond February 13, 2020, LINA conducted a skewed and self-interested investigation and evaluation of Plaintiff's claim, failed to apply the terms of the applicable LTD Plan and LTD Policy to Plaintiff's claim, mischaracterized record information and cherry-picked record information which might lend to support a claim denial while de-emphasizing or disregarding information supportive of Plaintiff's claim, failed to consider whether Plaintiff could perform the non-exertional duties of any-occupation she was

purportedly qualified for, unreasonably relied on unqualified nurses and/or an inappropriately qualified file-reviewing physician, and unreasonably relied on the opinions of file-reviewing physicians who never observed or examined Plaintiff and who conducted flawed and irrelevant reviews.

83.     Plaintiff has exhausted her administrative remedies.

## IV.     Statement of Claims

### First Claim

### ERISA – Improper Denial of Benefits

84.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 83 of this Complaint as though set forth at length herein and further alleges:

85.     At all relevant times, the terms of the LTD Plan and LTD Policy required payment of LTD benefits to Plaintiff due to her debilitating impairments.

86.     LINA's failure to pay LTD benefits to Plaintiff beyond February 13, 2020, is contrary to the terms of the LTD Plan, and is wrong, incorrect, and/or arbitrary and capricious.

87.     In determining Plaintiff's claim, LINA failed to provide her with a full and fair review as required by law, thereby making its final adverse claim decision wrong, unreasonable, and not supported by the competent and substantial evidence.

88.     Plaintiff seeks a declaration from this Court that she is entitled to the LTD benefits due her under the terms of the LTD Plan and LTD Policy, in the amounts and for the duration consistent with the terms of the LTD Plan and LTD Policy, and an Order that all future disability benefits  (and related other employee benefits, if any) should be paid pursuant to the terms of the LTD Plan and LTD Policy.

89.     Alternatively, Plaintiff seeks a declaration from this Court that LINA's final claim decision is not the product of a full and fair review, and a related Order therefore reinstating her LTD claim and remanding the matter to LINA for a full and fair review.

90.     By reason of LINA's incorrect, unreasonable, and/or arbitrary and capricious claim decision, Plaintiff has been forced to retain an attorney to secure the LTD benefits due her under the terms of the LTD Plan, for which Plaintiff has and will incur attorney fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1).  Plaintiff is entitled to recover the reasonable attorney fees and costs of this action pursuant to 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Plaintiff, Kelly Hazlitt, demands judgment against Defendant, Life Insurance Company of North America, as follows:

(1)     for a declaration that LINA improperly terminated her LTD benefits, and that she is entitled to receive the amount of benefits due under the terms of the LTD Plan that have not been paid, together with prejudgment and post-judgment interest thereon;

(2)     for a declaration that all future long term disability benefits (and related other employee benefits, if any) be paid pursuant to the terms of the LTD Plan; and/or

(3)     for a declaration that LINA improperly terminated her LTD benefits and denied her a full and fair review, and that as a consequence thereof, her claim should be reinstated and remanded for further claims procedures;

(4)     for the costs of this action, and Plaintiff's attorney fees pursuant to 29 U.S.C. § 1132(g); and

(5)     for such other and further relief as may be deemed just and proper by the Court.

Respectfully submitted,

SHOOK & JOHNSON, P.L.L.C.


By:    s/ Jonathan E. Shook
        Jonathan E. Shook, OBA #17343
        7420 South Yale Avenue
        Tulsa, Oklahoma 74136
        Telephone:  (918) 293-1122
        Facsimile:  (918) 293-1133

        ATTORNEY FOR PLAINTIFF